UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| L. Derek Truitt, | **COMPLAINT** |
| Plaintiff, | |
| -against- | Civil Action No. |
| David Geithner, individually and in his capacity as Chief Financial Officer of Condé Nast; and Condé Nast, | JURY TRIAL DEMANDED |
| Defendants. | |

COMES NOW Plaintiff, L. Derek Truitt ("Truitt"), by and through his attorney, Lawrence H. Fisher, and states this Complaint for libel and slander against Defendants, David Geithner ("Geithner"), individually and in his capacity as Chief Financial Officer of Condé Nast, as well as Condé Nast, as follows:

## PRELIMINARY STATEMENT

Truitt—a United States Army combat veteran—has been fighting homosexual discrimination for the past few years. Enter Geithner who sought out Truitt for a gay liaison that never occurred. While Geithner pursued this liaison, Truitt asked Geithner for help with his discrimination fight. Geithner was totally unsympathetic. Geithner's uncaring and hypocritical attitude toward gay rights upset Truitt for obvious reasons, but Truitt did not communicate this to Geithner. Instead, he simply contacted a reporter with his discontent. After Geithner's hypocrisy was reported, Geithner and his cronies orchestrated a false attack and accused Truitt of extortion and attempted extortion.

Indeed, after Geithner's homosexuality was exposed, headlines followed that falsely accused Truitt of extortion and attempted extortion. Unfortunately, Geithner fabricated these false accusations to deceive the public about his homosexuality and to redirect negative media attention away from Geithner toward Truitt.

These accusations of serious criminal conduct harmed Truitt beyond measure. A world of difference lies between Truitt's true report about his planned liaison with Geithner, versus Geithner's untrue allegations that Truitt threatened to expose Geithner's sexuality as part of a plot to extort money from Geithner. The former was a matter of fact. The latter never occurred. Truitt never threatened Geithner. He did not even inform Geithner that he intended to contact the media to report Geithner's hypocrisy. The allegations of extortion, and attempted extortion, were completely false.

## THE PARTIES

1. Plaintiff, L. Derek Truitt, is domiciled and resides in the State of Texas.

2. Defendant, David Geithner, is employed by Condé Nast, and works in New York City at 1 World Trade Center, New York, NY 10007.

3. Defendant, Condé Nast is an international publishing corporation with its principle place of business in New York City at at 1 World Trade Center, New York, NY 10007.

## JURISDICTION AND VENUE

4. L. Derek Truitt is a citizen of the State of Texas for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

5. David Geithner is a citizen of the State of New York for purposes of diversity

jurisdiction under 28 U.S.C. § 1332.

6. Condé Nast is a citizen of the State of New York for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

7. This Honorable Court has original subject matter jurisdiction with respect to this action, pursuant to 28 U.S.C. § 1332, as there exists complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interests and costs.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) as the libelous and slanderous statements at issue were made in this District.

## FACTUAL ALLEGATIONS

**A. Truitt's Background.**

9. Truitt, a United States Army combat veteran, was discharged after serving a tour of duty in Iraq. His service to our country, however, had an adverse effect on his mental health, and he was consequently diagnosed with recurring post-traumatic stress disorder. In sum, Truitt returned to Texas as a broken warrior in need of support and assistance to overcome the psychological weight of his tour of duty. Help has been lacking ever since.

10. Since his return, Truitt has struggled to survive and get by, including involvement in the adult entertainment industry.

11. Back in Texas, things got worse when Truitt became involved in a dispute with his landlord, who exhibited gay discrimination, which is prevalent among housing providers in Texas. Truitt contacted a variety of politicians, public figures, and others to help him combat this gay discrimination, including the United States Senator from Texas, Ted Cruz. To date, this

discrimination continues.

### B. Geithner Contacts Truitt for Purposes of Adult Entertainment.

12. Unrelated to the homosexual discrimination that Truitt was experiencing, on July 4, 2015, Truitt received a text message from a phone number that was recorded as 917-715-7836. The man who sent this text identified himself as "David." David was, in fact, David Geithner. Geithner initiated this contact seeking to pay Truitt $2,500 for an upcoming escort in Chicago, Illinois. This encounter was requested for the evening of July 11, 2015. Truitt agreed.

13. This was the first communication between Truitt and Geithner. The two previously had no relationship and were otherwise strangers.

14. To further coordinate their agreed upon encounter, Geithner followed up by calling Truitt on the telephone. It was Geithner's idea that the two speak on the phone. A text message between them reads: "Just tried you. . . . Call when convenient for you 917-715-7836."

15. At first—and for a while—the conversation was flirtatious, mutually-enjoyable, and positive. Geithner expressed interest in, and affection for, Truitt. Based on Geithner's tone, as well as the substance of their conversation, Truitt was enthusiastic about the possibility of developing a connection with Geithner beyond just escorting. The texts between the two after their initial phone conversations were also amiable. For example, a Truitt text from July 5, 2015 reads: "Love the picture, it matches your voice (Geithner sent Truitt a photo of himself embedded in a text message). You look a little like Tom Cruise. I told you yesterday you sounded attractive and sweet."

16. As the date of their planned encounter grew near, Geithner and Truitt continued to text and talk with each other. Ultimately, Geithner sent a partial payment to Truitt, via FedEx.

17. After additional interactions, Truitt finalized reservations to fly from his home in

Texas to Chicago on July 11, as Geithner requested. Truitt sent a picture embedded in a text that showed the itinerary and flight details to Geithner. Geithner thanked him for it, and reminded him to let Geithner know the hotel where he preferred to stay.

### C. Truitt Asks Geithner For Help With a Discrimination Problem.

18.     Following his initial contact with Geithner, Truitt did what any escort might do: he investigated the person contacting him. Given that Geithner had embedded a photo of himself into a text that he sent to Truitt, Truitt easily discovered Geithner's identity by inputting Geithner's phone number into a Facebook search. The search revealed a public Facebook page, maintained by Geithner, representing the phone number as Geithner's, and depicting photos of Geithner along with vast personal information. From there, Truitt learned that Geithner was a prominent man related to a former government official.

19.     Given the burgeoning trust between Geithner and Truitt, Truitt felt as though Geithner might be receptive to a plea for help with the gay discrimination that Truitt was confronting. Just maybe, Truitt thought, a man of Geithner's stature and connections could help.

20.     On July 10, 2015—the day before their planned encounter in Chicago—Truitt spoke to Geithner on the phone and spoke to Geithner about his views on gay discrimination. All of a sudden, Geithner's tone changed from how it had otherwise been and he abruptly ended the conversation.

21.     Nevertheless, the next morning—the day of their planned encounter—the two continued to communicate. Very early in the morning, Geithner eagerly sent text messages to Truitt about the logistics of their upcoming encounter. Truitt responded with a text message that clarified his hotel preference in Chicago, and then e-mailed Geithner some documents regarding his housing discrimination situation. In response to Truitt's email, Geithner resumed a curt manner,

and sent the following text message to Truitt: "at what point do you want to explain?" Truitt sent some text messages trying to explain, but suggested that the two should talk on the phone about it. Geithner refused to speak on the phone.

22. Instead, Geithner's text messages shifted to updates about travel difficulties that he was supposedly experiencing, while further ignoring Truitt's additional messages about housing discrimination. Truitt had a bad feeling about the way Geithner was refusing to speak on the phone, while ignoring his additional messages in the midst of sudden travel difficulties.

23. The two never meet in Chicago. On Truitt's part, he thought that Geithner was not likely to show given his out-of-the-blue claims about travel difficulties, as well as his abrupt refusal to speak on the phone, and his lack of response to numerous texts about discrimination.

24. To say the least, Truitt was bothered by Geithner's indifference to the discrimination Truitt was suffering, especially considering that Geithner was engaging Truitt for a gay encounter, but Truitt did not tell Geithner about his feelings at the time.

25. The next day, Geithner made it clear that he wanted no further communication between them. This indifference further insulted Truitt, but he kept his feelings to himself. Accordingly, Truitt agreed to discontinue contact with Geithner by sending "one last" text message on July 12, 2015.

26. Over the next few days, Truitt and Geithner did not communicate or attempt to communicate with each other at all.

**D. Truitt Contacts <u>Gawker</u>.**

27. As the days passed, the more Truitt thought about it, the more upset he became about Geithner's hypocrisy. Attempting to dissipate his growing angst, on July 15, 2015, Truitt sent a text to Geithner, seeking one more opportunity to express himself and elicit Geithner's help,

but Geithner ignored him. Truitt was now an emotional wreck about all that was happening in his life.

28. Indeed, Truitt was disturbed by an incident the previous year where he was the first to discover his best friend in the immediate aftermath of an apparent suicide from a self-inflicted gunshot. And the housing discrimination that Truitt was experiencing continued unabated. On top of it all, Geithner's hypocrisy and lack of empathy was too much to bear. Given his post-traumatic stress disorder, Truitt felt overwhelmed. Out of frustration, he did something that he admittedly regrets. Still, what he did was not extortion or attempted extortion.

29. On July 16, 2015 Truitt contacted Gawker, a New York based publication, but he never informed Geithner of his intent to do so or that he had done so. Truitt contacted Gawker to vent about hypocrisy. To a "tip" email address he sent only two screenshots of text messages between him and Geithner that explicitly showed what was going on between them. Truitt did not receive (and did not request) anything for this information. After Truitt contacted Gawker, Gawker immediately contacted Geithner.

30. The same afternoon, after Gawker contacted Geithner, Geithner hastily resumed contact with Truitt. In response, Truitt was finally able to explain that he felt hurt and upset about Geithner's reaction when asked for help with gay discrimination, specifically referencing Geithner's hypocrisy. In a text, Truitt explained himself this way: "I just hate that you contacted me and you want to be with a bi man but you don't care about [gay] rights."

31. Geithner sounded desperate and pathetic—as if revelations about his homosexuality would actually destroy his life—and he begged Truitt to stop Gawker from publishing anything. Truitt felt sorry for Geithner, and informed Gawker that he wanted to retract the story; he asked Gawker not to publish anything. In doing so, Truitt asked for nothing in return

from Geithner or anyone. Gawker published a story anyway.

### E. Gawker Publishes a Report About Geithner and Truitt.

32. On July 16, 2015 at approximately 5:30 PM, Gawker published a story, titled "Condé Nast's CFO Tried to Pay $2,500 for a Night with a Gay Porn Star," reporting that David Geithner had contacted a gay escort offering $2,500 for a homosexual encounter. The article is currently accessible in archived locations on the Internet.

33. For several hours thereafter, every headline that ran repeated the substance of the Gawker story: that Geithner "tried to hire a gay porn star. . . ." Gawker's leadership similarly echoed the substance of the story. Max Read: "given the chance Gawker will always report on married c-suite executives of major media companies fucking around on their wives."

34. At first, no one reported extortion, or attempted extortion, for the simple reason that no extortion, or attempted extortion, occurred.

### F. Geithner's False Statements and Allegations of a "Shakedown."

35. The first person who made any allegation about extortion was Geithner. In a false statement provided by Geithner directly to Gawker—where the reporter for Gawker fully revealed to Geithner everything that was known about his extensive communications with Truitt—Geithner stated:

> "I don't know who this individual is. This is a shakedown. I have never had a text exchange with this individual. He clearly has an ulterior motive that has nothing to do with me."

36. Thus, Geithner provided indisputably false statements to the media alleging that he did not know Truitt, and that he never had any text exchanges with him, and that Truitt was

perpetrating a "shakedown" due to some ulterior motive.

37. As spoken, these statements were slanderous; as reported by <u>Gawker</u>, these statements were libelous (and it was clearly Defendants' intent that <u>Gawker</u>, and subsequently others, report these false statements).

38. Allegations of a "shakedown" were not just false, they were outrageously false. From the time that Truitt asked for Geithner's help with gay discrimination, he never threatened Geithner for his help. Nothing corroborates any allegations that Truitt extorted, or attempted to extort, Geithner. There was no "shakedown." Rather, two days after Geithner first began ignoring and eschewing Truitt's request for help, in the absence of any "shakedown," communications between the two mutually ended, without any expression by Truitt that he intended to expose Geithner's sexuality. While Truitt stewed over Geithner's hypocrisy, Geithner only resumed contact with Truitt again *after* <u>Gawker</u> was tipped off by Truitt.

39. Horribly, what followed was based on Geithner's misrepresentations to <u>Gawker</u>, and reporters connected with Condé Nast began publishing reports accusing Truitt of extorting, or attempting to extort, Geithner.

40. Thousands of pages of search results, tweets, blog posts, and other content online reference these false accusations of extortion, identifying what appears to be over 200,000 records.

41. A forensic investigation has been conducted tracing the reporting of the stories accusing Truitt of extortion and attempted extortion. Although hundreds of thousands of news articles, tweets, posts, blog articles, and other content were posted, it appears that nearly all trace to less than a handful of original sources, all of which appear to have Condé Nast affiliations in the past or presently.

42. This forensic investigation identified pieces written by or on sites controlled by

Reddit, Nick Gillespie (Wired.com), Brian Doherty (Wired.com), Kurt Loder (Vanity Fair, The Scene, Wired, Vogue, Allure), Daniel Radosh (The New Yorker, GQ, Mademoiselle), and others.

43. These are just a few. There are over 1,000 pages of tweets and based on the findings from reviewing the first few hundred pages, it appears that the loudest voices amplifying the allegations of extortion and attempted extortion were all in one way or another affiliated with Condé Nast. Where there were previously no stories reported about extortion, or attempted extortion, these early pieces all published such allegations. These posts were shared thousands of times, according to public records merely hours after the initial Gawker story.

44. Truitt's believes that these false media reports of extortion and attempted extortion were fabricated to deceive the public about Geithner's homosexuality while redirecting negative media attention away from Geithner toward Truitt.

**G. The Defendants' Overwhelming Defamation.**

45. The information provided to Gawker by Truitt was indisputably and unassailably true. Geithner hired Truitt as a gay escort. Screenshots of the text messages exchanged between Geithner and Truitt constituted solid corroboration of this truth. The phone number from which these texts originated, 917-715-7836, was Geithner's. Photos embedded in the texts were not altered, nor was Geithner's image altered. Additionally, evidence of a partial payment for this escort encounter, by Geithner to Truitt, via FedEx, with a return address known to be a property owned by Geithner's family, was provided to Gawker upon request.

46. No concealment of Geithner's identity was promised by Truitt, or even discussed by Truitt and Geithner. Geithner readily disclosed his cell phone contact information to Truitt, and never asked that his identity be kept private. At no point did Geithner request that his sexuality be concealed or that his homosexuality be kept private. Geithner communicated with an escort he had

never met, using a personal cell phone number, real name, and sending a grinning photo of himself to the escort. Geithner sent a FedEx package, bearing his address information, to Truitt,[1] with partial payment for the services. None of these were private actions.

47.     Geithner had no expectation of privacy either. Geithner cannot assert that he has a reasonable expectation of privacy when providing his name and cell phone number to a stranger arranging the logistics of a homosexual escort. He has no reasonable expectation of privacy in his homosexuality as expressed to Truitt.

48.     No threats, or demands, were ever made regarding Gawker. Geithner simply refused Truitt's request for help with his housing problem and terminated contact with Truitt. Truitt accepted, albeit indignantly, Geithner's decision. Truitt never even informed Geithner of his intent publicize their interactions. Not a shred of proof, nor a piece of evidence, suggests that Truitt was attempting a "shakedown." Neither extortion, nor attempted extortion, of any kind occurred. In an act of free will to which he was completely entitled, Truitt simply contacted Gawker to vent his anger and expose Geithner's hypocrisy. At any time before doing so, he expressed no intentions or expectations to Geithner, who had absolutely no idea that Truitt was going to contact Gawker. Of note, when Geithner reinitiated contact with Truitt and asked him to ask Gawker not to run the article, Truitt exhibited compassion for Geithner and asked Gawker, several times, to retract his statements and refrain from publishing the article. Gawker refused.

49.     Geithner's statements to Gawker were factually false. Geithner fabricated false information and provided it to Gawker, namely, that he was being subject to a "shakedown" by Truitt, that he did not know who Truitt was and that he had not ever exchanged text messages with

---

[1] The return addressee, however, identified an alias that Geithner later acknowledged as his Gmail account name.

Truitt. Because the evidence that demonstrated Geithner's homosexuality consisted of extrinsic evidence (i.e., screenshots of the texts), Geithner could not dispute it, but he lied and disputed it anyway. Then, he and his representatives did everything possible to attack Truitt's credibility and character by literally making up false facts to respond to truthful facts damaging to Geithner.

50. Defendants falsely accused Truitt of felony extortion and attempted extortion through deliberate misstatements of the facts and amplification of those facts through media outlets apparently affiliated with Condé Nast. This accusation of criminal conduct has harmed Truitt beyond measure. Truitt asserts that Geithner and Condé Nast, by acts of providing false information, false statements, and directing media coverage of those false statements, caused damage and injury to Truitt. As a result, a headline that reported on a "married-with-children CFO's hiring of a gay escort" became a headline that accused Truitt and Gawker of "conspiring together to blackmail a private citizen."

51. As serious criminal accusations, false statements accusing Truitt of extortion and attempted extortion are actionable. These false accusations of criminal activity constitutes slander when they were spoken by Geithner, and libel when printed by Gawker (and it was clearly Defendants' intent that Gawker, and subsequently others, report these false statements).

52. Individuals' rights are not determined by their sexual preferences, nor their acts of free will. Regardless of Truitt's sexuality, or his association with adult entertainment, or what he does to in his day-to-day life, he is not and has never been engaged in extortion, of any kind or nature, of anyone.

**CAUSE OF ACTION FOR LIBEL AND SLANDER AGAINST ALL DEFENDANTS**[2]

53. Plaintiff, L. Derek Truitt, hereby incorporates, adopts, and re-alleges Paragraphs 1 through 52 of this Complaint as if fully set forth herein.

54. The gist of Defendants' publication is that Truitt is a despicable person worthy of public contempt. Defendants created this gist by falsely stating that Truitt engaged in extortion or attempted extortion.

55. Truitt did not engage in any of the unsavory and disreputable acts for which he stands accused by Defendants.

56. The gist of Defendants' statements are false and defamatory and constitutes libel and slander *per se*, and/or libel and slander by implication, in that they impute to Truitt numerous unsavory and disreputable acts that injure his reputation.

57. Defendants published the libelous and slanderous statements without any privilege.

58. Major publications around the country, and Internet websites, republished Defendants' libelous and slanderous statements.

59. Defendants' libelous and slanderous statements are still available, as of the date of the filing of this Complaint, on numerous Internet websites.

60. Defendants' libelous and slanderous statements are false because Truitt did not engage in extortion, attempted extortion, or any sort of shakedown.

61. These libelous and slanderous statements constitute libel and slander *per se* and are defamatory because, among other things, they convey to the average, right-thinking person the

---

[2] Plaintiff uses the terms "slander" to refer to the spoken statements by Geithner, and "libel" to refer to those statements as they appeared in print. At all times material hereto, Plaintiff alleges that Defendants' intent was for <u>Gawker</u>, and subsequently others, to report these false statements.

totally untrue contention that Truitt was involved in serious criminal conduct.

### Publication with Actual Malice

62. Defendants published their libelous and slanderous statements with actual malice.

63. Defendants possessed actual knowledge of the falsity of their libelous and slanderous statements about Truitt and acted with reckless disregard for the truth in maliciously publishing all of the false and defamatory statements about Truitt.

### Publication with Common Law Malice

64. Defendants published their libelous and slanderous statements with common law malice, that is, maliciously, wantonly, recklessly, and/or in willful disregard for Truitt's rights.

65. Defendants maliciously, wantonly, recklessly, and/or in willful disregard for Truitt's rights, published their libelous and slanderous statements to intentionally harm Truitt.

66. Defendants maliciously, wantonly, recklessly, and/or in willful disregard for Truitt's rights, published their libelous and slanderous statements to ruin Truitt's reputation.

67. The maliciousness, wantonness, and/or recklessness of Defendants' libelous and slanderous statements, and/or willful disregard for Truitt's rights in maliciously publishing the same, is evident from Defendant Geithner's ill-will toward Truitt for exposing his hypocrisy, infidelity, and homosexuality.

**Respondeat Superior and Joint and Several Liability**

68.  Defendant Condé Nast was complicit in the publication of the libelous and slanderous statements, in that they authorized, participated in, and/or ratified their publication.

69.  Geithner was acting within the scope of his employment with, and as an agent for Condé Nast, upon maliciously publishing the libelous and slanderous statements at issue.

70.  Geithner's acts and omissions are imputed to Condé Nast as a matter of law.

71.  Geithner's state of mind with respect to the publication of the libelous and slanderous statements, including his knowledge or lack of knowledge regarding the truth or falsity of those statements, is imputed to Condé Nast as a matter of law.

72.  Defendant Condé is therefore vicariously and/or joint and severally liable under the theory of Respondeat Superior for Geithner's publication of the libelous and slanderous statements.

**Damages**

73.  As a direct and proximate result of the libelous and slanderous statements published by Defendants, Truitt's reputation has been permanently damaged.

74.  As a direct and proximate result of the libelous and slanderous statements published by Defendants, Truitt has suffered adverse physical consequences from stress, emotional distress, and mental pain and suffering.

75.  As a direct and proximate result of the libelous and slanderous statements published by Defendants, Truitt has suffered worldwide hatred, contempt, and ridicule.

76.  The false and defamatory statements published by Defendants were libelous and slanderous *per se* in that they impute an unsavory, salacious, and disreputable character to Truitt,

injurious to his reputation, entitling Truitt to presumed damages.

77. The false and defamatory statements published by Defendants were libelous and slanderous *per se* in that they impute that Truitt was involved in the serious criminal conduct of extortion, entitling Truitt to presumed damages.

78. The conduct of Defendants demonstrates willful misconduct, and that entire want of care that raises a presumption of conscious indifference to consequences such that Truitt is entitled to an award of punitive damages from Defendants in order to punish Defendants and deter them from repeating their unlawful conduct.

79. The false and defamatory statements of Defendants were published with both actual malice and common law malice such that Truitt is entitled to an award of punitive damages from Defendants in order to punish Defendants and deter them from repeating their unlawful conduct.

WHEREFORE, Plaintiff, L. Derek. Truitt, demands:

(a) That judgment be entered against Defendant Geithner, and Defendant Condé Nast, jointly and severally, for compensatory damages in an amount of $5,000,000.00;

(b) That judgment be entered against Defendant Geithner, and Defendant Condé Nast, jointly and severally, for punitive damages in an amount to be determined by a jury from this jurisdiction so as to punish Defendants and to deter Defendants from repeating their unlawful conduct;

(c) That all costs of this action be assessed against Defendant Geithner, and Defendant Condé Nast.

(d) That this Honorable Court award such other relief as it deems equitable, just, and proper.

***Trial Jury Demanded***

Respectfully submitted,

BY:   /s/ Lawrence H. Fisher
        Lawrence H. Fisher, Esquire
        One Oxford Centre
        301 Grant St., Suite 4300
        Pittsburgh, PA 15219
        t. 724.986.9785

DATED: November 9, 2015